**Lavonzo CHAMBERLAIN, Appellant,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Appellee.**

No. 94–2066.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1994.

Decided Feb. 15, 1995.

---

John A. Bowman, Davenport, IA, argued, for appellant.

Gary Lee Hayward, Des Moines, IA, argued, for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BARNES,[1] District Judge.

BARNES, District Judge.

Lavonzo Chamberlain applied for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) in April of 1991. Chamberlain's applications were denied by the Secretary of Health and Human Services, and the district court affirmed the decision. Chamberlain appeals the district court's order, and we affirm.

## I. BACKGROUND

Chamberlain is a man between forty and forty-five years old[2] who quit high school in the tenth grade. He later achieved his General Equivalency Diploma in 1977, and also participated in a business management correspondence course. He has worked as a truck driver, crane operator, laborer, and owned an asphalt and construction business. He alleg-edly became disabled on November 18, 1990, due to back problems, asthma, high blood pressure, mental depression, allergies, and sub-normal intelligence.

Chamberlain was hospitalized in October of 1973 with acute low back pain from a work injury. Chamberlain's x-rays revealed a normal lumbar myelogram and cervical myelogram. He was discharged with a diagnosis of acute low back pain with probable psychophysiological reaction or conversion reaction. The next month, in November of 1973, Chamberlain was hospitalized for a lumbar hemilaminectomy with decompression of the nerve root. His condition was improved at the time of his discharge.

In March and April of 1984, Chamberlain sought chiropractic treatment for neck pain, headaches, light chest pain, low back and leg pain, and numbness in his legs and hands. In December of 1984, Chamberlain sought medical treatment for acute lumbar strain after falling on ice. He had full forward flexion and extension, and lateral bending with mild pain. X-rays revealed no bony abnormalities. During his follow-up exam on February 4, 1985, Chamberlain exhibited no hip motion limitations and performed straight leg raising exams with no difficulty. He was released to work with no physical limitations.

Chamberlain again sought chiropractic treatment in September of 1986 for complaints of acute traumatic cervical, thoracic, and lumbosacral strain after his involvement in an auto accident. He received treatment until March 16, 1987. The chiropractor reported that Chamberlain had no permanent disability indications.

Dr. John T. Johnson treated Chamberlain from November 14, 1988, through April 12, 1991. Dr. Johnson prescribed blood pressure medicine for Chamberlain in December of 1989. From March to June of 1990, Dr. Johnson treated Chamberlain for low back pain and neck soreness. Dr. Johnson's records also reflect that Chamberlain was upset

---

1. The Hon. Harry F. Barnes, United States District Judge for the Western District of Arkansas, sitting by designation.

2. Chamberlain is uncertain of his exact birth date. The ALJ found that Chamberlain is between forty and forty-five years old. This finding is not challenged.

and depressed. Chamberlain returned on April 12, 1991, complaining of low back pain. Dr. Johnson prescribed pain medication for Chamberlain, but made no notations restricting Chamberlain's activities in any way.

Chamberlain then applied for DIB on April 17, 1991, and SSI benefits on April 19, 1991, stating that he was no longer able to lift, be on his feet, or drive heavy equipment for extended periods of time. He stated that his doctors restricted him from heavy lifting and bending. Chamberlain also reported that Dr. Johnson warned that further construction work could paralyze him. Chamberlain listed his activities as cleaning house, shopping, cooking, fishing, and driving a car. His work duties included using asphalt pouring machines, using tile and trench digging equipment, bidding on jobs, and supervising his employees.

Dr. D.K. Mokhtar examined Chamberlain on May 31, 1991, and reported Chamberlain as having average intelligence and fluent speaking ability. Chamberlain had subjective complaints of allergies and asthma, was slightly depressed, and exhibited exogenous obesity. Chamberlain exhibited a normal gait, was able to walk tip toe and heel without difficulty, and was able to squat and rise with low back pain. He had minimal pain and tenderness of the paravertebral tissue, mostly in the neck and paravertebral area, slight scoliosis of the thoracolumbar region and moderate loss of lumbolordotic curve. Chamberlain exhibited fairly good range of motion of all joints of the body. Dr. Mokhtar concluded that Chamberlain should not lift in excess of twenty-five pounds infrequently and ten to fifteen pounds frequently. He should alternate standing and sitting every one-half to one hour, with walking up to four to five miles daily, and avoid stooping, climbing, kneeling, crawling, and certain environmental conditions. X-rays revealed no bony or soft tissue abnormalities.

Dr. D.V. Domingo, a psychiatrist, examined Chamberlain on October 8, 1991. Chamberlain reported drinking excessively since 1989 to forget his problems. The record shows that this is Chamberlain's first allegation of excessive drinking. He alleged drinking two pints of whiskey and a twelve pack of beer sometimes daily; however, Dr. Domingo noted that Chamberlain had no alcohol-related legal problems, he had never received alcohol treatment or had delirium tremens, nor was there alcohol on his breath. Dr. Domingo reported that Chamberlain walked with a limp and had his left arm in a sling. Chamberlain reported having pain in his left arm since April of 1991. Chamberlain also reported using a cane and crutches at home. Dr. Domingo concluded that Chamberlain was unable to concentrate well in any kind of work due to his probable low I.Q., alcoholism, depression, and chronic pain.

Chamberlain's applications for DIB and SSI benefits were denied initially and upon reconsideration. Chamberlain requested and received a hearing before an Administrative Law Judge (ALJ) which was held on March 4, 1992. Chamberlain testified that he was taking Motrin and muscle relaxers for his lower back and arm pain. He stated he was unable to lift his twenty-five pound daughter and was restricted from all lifting by his treating physicians. He reported being unable to sit more than one hour and was unable to walk more than one block. The ALJ asked Chamberlain if he had any problems with bending or stooping to which Chamberlain replied he had trouble using the bathroom properly. Chamberlain testified that his family members helped with household chores, he could drive, he shopped, he had been unable to participate in outdoor activities for at least three years, was depressed easily, had bad asthma, high blood pressure, and previously had a drinking problem.

The ALJ posed a hypothetical to a vocational expert regarding a forty-five year old male with a ninth grade special education and the same past work experience as Chamberlain. The restrictions included lifting up to twenty pounds occasionally, ten pounds frequently, sitting and standing of up to thirty minutes each with ability to alternate positions, walking up to one block, occasional kneeling and crawling, and traveling limited to one hour followed by a rest period. The jobs also had to be limited to simple, routine tasks, without exposure to extremes of heat and cold, or to concentrated amounts of dust,

fumes, odors, gases, or poor ventilation. The vocational expert opined that Chamberlain's skills would not be transferrable under the above limitations, but found Chamberlain would be able to perform unskilled jobs at a light level such as assembly and/or packaging work, of which approximately 2,500 jobs existed on a statewide basis for each position and 125,000 jobs for each position nationally. During the cross-examination of the vocational expert, Chamberlain's counsel posed the additional restrictions of difficulty of concentration and failure to complete tasks in a timely manner. The vocational expert stated that those additional factors would preclude competitive employment.

After the hearing, the Disability Determination Services referred Chamberlain to Dr. J.R. Lee for further examination. On June 2, 1992, Chamberlain arrived at the examination using a cane and alleged that he had been using the cane for a year. Chamberlain had approximately sixty degrees flexion of his dorsal lumbar spine, ten degrees extension, thirty degrees when bending right and left, and thirty degrees when turning left and right. Dr. Lee concluded that Chamberlain could occasionally lift twenty pounds, frequently lift ten pounds, could stand or walk up to six hours, could occasionally stoop, kneel, climb or crawl, had some environmental limitations, and had no restrictions on reaching, pulling, pushing, or speaking.

On July 18, 1992, Chamberlain was evaluated by Dr. Charles F. Elmendorf. A letter from this doctor stated that Chamberlain's decreased range of motion in the lumbar spine made it impossible for Chamberlain to perform jobs with any degree of bending or stooping, and Chamberlain could not tolerate sitting or standing for more than thirty minutes without pain. Dr. Elmendorf noted that Chamberlain had duodenal ulcers and hypertension. The doctor concluded that Chamberlain was totally disabled, but did not support his conclusions with any objective medical tests or findings.

Finally, the ALJ sent interrogatories to Dr. J. Scott Morrison, a psychiatrist, to assess Chamberlain's mental capacity based upon the record. Dr. Morrison found that Chamberlain had no mental disorders meeting the listing of the Social Security Act, noting that there was no evidence of organic brain syndrome in regard to Chamberlain's alleged alcohol abuse. Dr. Morrison stated that Dr. Domingo's conclusions of Chamberlain's poor concentration were based upon unreliable factors.

The ALJ found that the medical evidence established Chamberlain had severe cervical and/or lumbar strain, arthralgia of multiple joints, asthma and allergies (by history only), mild depression, excessive use of alcohol in remission (by history only), possible peptic ulcer disease, well-controlled hypertension, and obesity. However, the ALJ found that Chamberlain did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ further found that Chamberlain's claims of incapacitating pain were not credible and determined that Chamberlain was able to perform the jobs cited by the vocational expert. The district court affirmed the ALJ on all issues finding that there was substantial evidence on the record as a whole to support the ALJ's findings.

## II. DISCUSSION

Chamberlain contends that the ALJ failed to adequately consider his treating physician's opinion, failed to properly evaluate his subjective complaints of pain, and failed to pose a hypothetical question to the vocational expert that fully set forth his impairments. Chamberlain also contends that the district court erred in finding that he waived his right to cross-examine Dr. J. Scott Morrison.

The district court must be affirmed if there is substantial evidence in the record as a whole to support the Secretary's decision. *Russell v. Sullivan,* 950 F.2d 542, 544 (8th Cir.1991). Evidence that detracts from the record is considered, but the decision will be affirmed where the evidence as a whole can support either outcome. *Rautio v. Bowen,* 862 F.2d 176, 178–79 (8th Cir.1988).

### A. Treating Physician's Opinion

Chamberlain contends that the letter from his treating physician, Dr. Elmendorf,

proves that he is unable to perform jobs requiring any bending or stooping. Chamberlain states that since he is unable to bend or stoop, he is entitled to benefits as a matter of law.[3] Chamberlain is correct when asserting that medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician. *See Matthews v. Bowen,* 879 F.2d 422, 424 (8th Cir.1989) (citing *Ward v. Heckler,* 786 F.2d 844, 846 (8th Cir.1986)). However, a treating physician's opinion is "not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data." *Id.* The weight given · a treating physician's opinion is limited if the opinion consists only of conclusory statements. *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994) (citing *Thomas v. Sullivan,* 928 F.2d 255, 259 (8th Cir.1991)).

■ Dr. Elmendorf failed to discuss the degree of Chamberlain's decreased range of motion, nor did his report cite any objective medical tests or diagnostic data to support his conclusions that Chamberlain was unable to bend or stoop and was totally disabled. All of Chamberlain's various x-rays disclosed no abnormalities, and the range of motion exams administered by Drs. Mokhtar and Lee revealed Chamberlain's ability to occasionally bend or stoop. Also, the ALJ specifically questioned Chamberlain regarding his ability to bend or stoop, to which Chamberlain replied only that he had trouble using the bathroom. Dr. Elmendorf's conclusions regarding Chamberlain's abilities differ significantly with the evidence in the record as a whole, especially when considering that Dr. Elmendorf's conclusions were drawn only six weeks after Dr. Lee's. Further, the ALJ did credit Dr. Elmendorf's findings that were consistent with the record. The ALJ followed the substantial evidence in the record and rightly discounted Dr. Elmendorf's conclusory findings of Chamberlain's inability to bend or stoop and his total disability.

**B. Subjective Complaints of Pain**

Chamberlain contends that the ALJ improperly relied upon inconsistencies in the non-medical record when discounting Chamberlain's testimony regarding his pain and functional restrictions. The record is clear that the ALJ considered objective medical evidence as well as Chamberlain's own statements and representations.

■ An ALJ may not disregard a claimant's subjective pain allegations solely because they are not fully supported by the objective medical evidence. *Sullins v. Shalala,* 25 F.3d 601, 603 (8th Cir.1994). Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Id.* Other factors to consider in addition to the absence of objective medical evidence are the claimant's previous work record; duration, frequency and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.1984) (subsequent history omitted). Where conflicting allegations and claims exist, credibility findings are for the ALJ to make. *Smith v. Heckler,* 760 F.2d 184, 187 (8th Cir.1985). The ALJ is permitted to disbelieve subjective allegations of pain where inconsistencies exist in the record. *Id.*

■ The ALJ wrote an exhaustive opinion chronicling Chamberlain's inconsistent statements and allegations. Chamberlain's DIB and SSI applications in April of 1991 stated that Chamberlain cleaned house every other day, shopped, cooked, fished, visited relatives, and drove a car and pick-up. Chamberlain told Dr. Mokhtar in June of 1991 that his activities included fishing, driving, baby sitting and walking five miles daily. The

---

3. Chamberlain relies upon Social Security Rule 85–15 for the proposition that his inability to bend or stoop precludes all employment:

   *[2.] b. Stooping, kneeling, crouching, and crawling* are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending. Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved. If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact.

next month, however, Chamberlain's attorney completed a form stating that Chamberlain couldn't work around the house, couldn't travel much anymore, and was depressed.

Chamberlain saw Dr. Domingo in October of 1991 and reported that he had been using a cane for a year. Nothing in the record prior to that time indicates that Chamberlain was using a cane. Chamberlain also reported drinking excessively since 1989; however, a few months previously, Chamberlain had told Dr. Mokhtar that he drank only once a month since the age of fifteen. Chamberlain had written a letter to the Disability Determination Services in April of 1991 complaining that he would get benefits if he were a "wine drinker or dope user." These actions indicate Chamberlain exaggerated his condition in order to get benefits. Further, Chamberlain told Dr. Domingo that his treating physician, Dr. Johnson, warned that Chamberlain would be paralyzed if he returned to work. Dr. Johnson's records place no physical restrictions on Chamberlain.

Dr. Lee evaluated Chamberlain on June 2, 1992, and reported that Chamberlain was using a cane. Dr. Lee is the only witness to Chamberlain's use of a cane. Dr. Lee noted that Chamberlain entered the office with the cane in his right hand, but Chamberlain stated he used the cane in his left hand to support his left leg.

The record shows that Chamberlain was prescribed Naprosyn and Motrin, along with Tylenol Gel-caps, for his pain. Chamberlain testified that the Motrin he was taking at the time of the hearing made him sleepy; however, he took no steps to seek alternative treatment with less side effects. Chamberlain refused to have surgery because his last surgery in 1973 "scared" him. Failure to seek aggressive medical care is not suggestive of disabling pain. *Barrett v. Shalala,* 38 F.3d 1019, 1023 (8th Cir.1994); *Rautio v. Bowen,* 862 F.2d 176, 179 (8th Cir.1988).

Considering the record as a whole, Chamberlain's complaints are not supported by the substantial evidence, and the ALJ properly considered the *Polaski* factors in determining that Chamberlain's subjective pain complaints were unsupported as to the extent alleged.

## C. Hypothetical Question

■ Chamberlain contends that the hypothetical question posed to the vocational expert failed to encompass all of his impairments. An ALJ's hypothetical question must fully describe a claimant's impairments. *Shelltrack v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991). A vocational expert's testimony based upon an insufficient hypothetical question does not constitute substantial evidence to support a finding of no disability. *Id.*

■ Chamberlain contends first that the ALJ failed to include his inability to bend or stoop in the hypothetical. Although the ALJ did not use the specific words, "bend and stoop," the question did supply restrictions of occasional kneeling and crawling. Social Security Ruling 85–15 treats bending and stooping synonymously with kneeling and crawling. There is substantial evidence in the record supporting the ALJ's findings that Chamberlain could occasionally perform these activities. Also, the vocational expert was present during the hearing and was aware of Chamberlain's alleged impairments. *See, e.g., Jenkins v. Bowen,* 861 F.2d 1083, 1087 (8th Cir.1988).

■ Chamberlain argues next that the ALJ failed to ask the vocational expert to assume any mentally-based restrictions other than a limitation of "simple, routine tasks." Chamberlain claims that exams by Dr. Steven G. Warner and Dr. Domingo support a conclusion that he is unable to concentrate or complete tasks in a timely manner. Dr. Warner's report shows that Chamberlain's inability to concentrate is totally self-reported, and that Chamberlain is fully capable of performing simple, routine tasks. Dr. Domingo primarily relied upon Chamberlain's self-reported alcoholism, depression, and chronic pain when concluding Chamberlain's concentration was hampered. Also, Dr. Morrison found Dr. Domingo's test of serial subtraction unreliable in determining concentration. The record is clear that the hypothetical posed to the vocational expert sufficiently set forth Chamberlain's impairments which the ALJ accepted as true. *Rautio v. Bowen,*

862 F.2d 176, 180 (8th Cir.1988). We will not disturb this finding on appeal.

### D. Post-hearing Physician Interrogatories

The ALJ propounded interrogatories to Dr. Morrison after the hearing to evaluate Chamberlain's mental ability. The ALJ informed Chamberlain's attorney of the interrogatories and gave him ten days to object to the questions or propose his own. The attorney replied that he did not waive his right to cross examine Dr. Morrison if a fully favorable decision could not be reached. The district court found this reply "unreasonable" since the attorney wished to postpone any cross-examination until after the ALJ made his decision.

On appeal, Chamberlain contends that the ALJ erred in not advising him of his right to request a supplemental hearing. This argument is not well taken. Due process is served when a claimant and his attorney are given the opportunity to cross-examine and subpoena individuals giving post-hearing reports. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). It is the responsibility of the claimant and his attorney to provide the opportunity for the cross-examination. *Id.* The ALJ is not required to inform the claimant's attorney of the claimant's right to cross-examine the post-hearing witness. *Coffin v. Sullivan,* 895 F.2d 1206, 1212 (8th Cir.1990). "[I]f the claimant's attorney fails to object to the post-hearing reports or remains silent when the opportunity to request cross-examination arises, the right to cross-examination is waived." *Id.* Therefore, the district court was correct in holding that the right to cross-examine Dr. Morrison was waived.

### III. CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

1. *See* Record at 178, 196–98, 218, 220, 226–28.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent. In my view, substantial evidence on the record as a whole does not support the finding of the administrative law judge (ALJ) that Lavonzo Chamberlain can perform full-time, light work in our competitive economy.

As is frequently the case, much of the record cannot be deciphered.[1] I have done my best to read it from beginning to end, a task that took much longer than it would have if the Secretary had fulfilled his responsibility to present a legible record to us. But the ALJ, the district court judge, and my colleagues have made the best of a bad situation, and I will too.

At the outset, it is significant that Chamberlain has worked diligently since he was 17 years old as a factory worker, a farm worker, a soldier, a construction worker, a truck driver, and a warehouseman. After working all of these years for others, he opened his own asphalt and construction business, which he operated for an additional four years. Chamberlain managed to work during all of this time even though he sustained at least three serious injuries, had only a limited education, and marginal intelligence—hardly the picture of the malingerer the ALJ goes to great length to paint in his decision. While I am not willing to accept Chamberlain's claim that the ALJ is racially biased, I cannot read the ALJ's decision without questioning his impartiality.

In my view, one cannot read this record from beginning to end without concluding that Chamberlain cannot possibly perform light work in our competitive economy due to his physical and mental limitations. The vocational expert called by the ALJ was given the following hypothetical:

> [Chamberlain is a 45–year–old] male, [with a] ninth grade special education. [He has the ability] to lift up to 25 pounds occasionally, 10 pounds frequently. Ability to sit from a half hour to an hour. Standing from a half hour to an hour with ability to alternate those positions. Walking 4 to 5 miles. Only occasional kneeling or crawling. Jobs would need to be limited to simple routine tasks. The need to avoid

concentrated exposure to dust, fumes, odors, gases and poor ventilation. Would also need to avoid concentrated exposures to extremes of heat and cold and traveling would be limited to one hour with the need for a rest period after this hour.

Rec. at 85. Based on this hypothetical, the expert stated that Chamberlain would not be able to perform any of his past relevant work and that he did not have any transferable skills. The expert was then asked whether Chamberlain was capable of performing any jobs of an unskilled nature, to which the expert responded:

I'd say something along the lines of some kind of assembly, packaging work that could be done in a ... factory setting. There are jobs that don't involve concentrated exposure to these environmental factors that would allow alternation of position between sitting and standing on a half hour to an hour basis surely and would be within the lifting limitation. Various types of assembly jobs would be under Code Number 706.687–010 in the *Dictionary of Occupational Titles*. At a light level I think you're probably talking about 2500 jobs on a statewide basis; 125,000 jobs nationally; and the same numbers I think would hold true for work as a packager in various industries, Code Number 920.587–018. Additional work as ... a guard inside, various types of security guards working inside. The code is 372.667–034. That's light work activity and we're looking at 3000 jobs; 150,000 jobs nationally. Those would be representative of types of work that would be consistent, I think, with the limitations that you indicated.

*Id.* at 86. He was asked a second hypothetical not relevant to this dissent. A third hypothetical was then posed: "[A]dd ... [to what I have already stated] that there would need to be rest periods of up to two hours during an 8 hour work day. Would that change any of your answer?" The expert responded, *"Yes, I think that would preclude regular full-time competitive employment." Id.* at 87 (emphasis added). Finally, the ALJ asked the expert to consider that Chamberlain

often has deficiencies of concentration, persistence, or pace resulting in [a] failure to complete tasks in a timely manner in a work setting or elsewhere and he's limited in carrying out instructions, maintaining attention, concentration and pace, getting along with people, using his judgment, responding to changes in the workplace.

*Id.* at 88. The expert replied: *"Okay. I would say that ... those factors would preclude competitive employment* and the only one that really would be that significant I think would be [that he] often found difficulty with concentration and [failed] to complete tasks in a timely manner." *Id.* (emphasis added).

On the basis of the expert's testimony and the findings of Dr. Domingo, a psychiatrist called upon by the Secretary to examine Chamberlain, the ALJ had no alternative but to find that Chamberlain was disabled. Dr. Domingo found that Chamberlain was mildly depressed, had difficulty concentrating, was alcohol dependent, had a probable low I.Q., and had a history of back injury with chronic pain. He concluded as follows:

I don't think he can concentrate too well in any kind of work because of his alcoholism, depression and chronic pain. Because of the above conditions, it would limit his activities in carrying out instructions, maintaining attention, concentration, pace, getting along with people, his judgment, responding to changes in the workplace and I don't think his concentration is good enough to remember and understand instructions, procedures and locations from time to time.

*Id.* at 250.

Ostensibly to avoid the impact of Dr. Domingo's potent testimony, the ALJ concluded that the doctor's testimony was based on misleading and incomplete information. I cannot agree with this finding, just as I cannot agree with a great deal of the ALJ's reasoning and conclusions in this case.

First, Dr. Domingo was selected by the Secretary, not Chamberlain. Having selected Dr. Domingo, the Secretary (and the ALJ as well) must assume some responsibility for the doctor's conclusions.

Second, if the ALJ truly believed that Dr. Domingo had not been given accurate information or was incapable of separating true claims from spurious ones, the ALJ had the option of furnishing Chamberlain's complete medical and work records to Dr. Domingo and asking him to reconsider his opinion. The ALJ failed to do so, opting instead to blind side not only the claimant but the doctor as well.

Third, not satisfied with Dr. Domingo's report, the ALJ sent Chamberlain's so-called "file" to another psychiatrist, Dr. Morrison, along with three pages of interrogatories. The record does not reveal what was in the file. Thus neither the majority nor I know what Dr. Morrison received. All we know is that Dr. Morrison never saw the claimant and never visited with him. Moreover, the only question posed to Dr. Morrison to which a substantive response was given was inconclusive. The ALJ asked him: "Based on your review of the exhibits enclosed, does the claimant's condition meet the medical criteria of any specific listed impairment set out in section 12.00, *et seq.*, of the Listing of Impairments?" Dr. Morrison answered, "No," and offered the following explanation:

Although [Chamberlain] is reported to have mild depression, this does not seem to be major. He has a history of alcohol abuse but is reported to be astaining [sic] from alcohol currently, & there is no evidence of organic brain syndrome [due] to alcohol abuse. The psychiatric examiner is concerned about his concentration, based on poor serial subtractions, but in view of his subnormal intelligence & limited education, this is not a reliable test of concentration.

*Id.* at 292. Dr. Morrison's answers hardly helped resolve whether Chamberlain is able to perform the light work identified by the vocational expert. At most, they indicate that Chamberlain does not meet the conditions of a *specific listed impairment.* The answers in no way refute Dr. Domingo's conclusions that Chamberlain's multiple disabilities preclude his performing work in the local or national economies.

Fourth, Dr. Elmendorf, Chamberlain's treating physician, reported that Chamberlain's chronic back condition necessitated the use of anti-inflammatory agents that caused a peptic ulcer; that he has hypertension; and that he has decreased range of motion in the lumbar spine, which makes it impossible for him to perform jobs that require any degree of bending or stooping. *Id.* at 288. Dr. Elmendorf further reported that Chamberlain cannot tolerate sitting or standing for more than half an hour without pain and that there currently is no surgical treatment for his condition. In his opinion, Chamberlain was "totally disabled." *Id.* The ALJ rejected the doctor's conclusion because, according to him, the report was not fully documented. The simple remedy for this deficiency would have been to request whatever additional information the ALJ felt was appropriate.

Fifth, Dr. Lee, who examined Chamberlain at the request of the ALJ in June 1992, diagnosed his condition as "1. Residual Back Pain Secondary Due to Herniated Disc, Treated by Two Lumbar Laminectomies[,] and 2. Arthralgia, Multiple Joints, Etiology Unknown." *Id.* at 278. He found that Chamberlain also had a stomach ulcer and a history of asthma, alcohol abuse, and depression. *Id.* at 277–78. Dr. Lee drew no conclusion as to whether, in light of claimant's multiple disabilities, he was disabled.

Sixth, Dr. Warner, a state agency psychologist who offered his opinion of Chamberlain in October 1991, found that Chamberlain was mildly depressed with alcohol dependency; had an adjustment disorder; and appeared to function in at least a normal to dull normal range. Consistent with Dr. Domingo's findings, he additionally found that Chamberlain would have moderate limitations in his ability to remember, understand, perform detailed instructions, and maintain his attention and concentration—findings that appear to have been altogether ignored by the ALJ. *Id.* at 254–55.

Seventh, Dr. Mokhtar, who examined Chamberlain at the request of the State of Iowa, found that he had asthma, hypertension, ulcers, depression, and chronic cervical and lumbar strain. He recommended that Chamberlain avoid stooping, climbing, kneeling and crawling. *Id.* at 234. Again, no conclusion was made as to whether Chamberlain is capable of doing light work—work that requires some stooping—which the voca-

tional expert testified he is capable of performing.

Eighth, the ALJ questioned Chamberlain's credibility based on Chamberlain's uncertainty about his birthdate. Chamberlain testified at the administrative hearing that he had been "lied to so many times" about his birthdate that he could not say for certain when he was born. Given claimants' often disjointed family histories, I am less astonished than the ALJ that a claimant might be unable to articulate precisely what his birthdate is. In any event, I do not see how a claimant's inability to articulate exactly when he was born is any reason to seriously question his credibility.

Last and perhaps most significantly, the ALJ questioned Chamberlain's credibility based on an alleged telephone call made in March 1992 to a local social security office by one of Chamberlain's "relatives," without ever verifying the phone call. The relative stated that Chamberlain "was going around asking people to sign papers saying they go into his home to help him out with things ... he couldn't do for himself," in an apparent attempt to bolster his disability claim. *Id.* at 42. The caller reportedly was asked by Chamberlain to sign a statement acknowledging Chamberlain's inability to do things for himself, but refused. In response to Chamberlain's attorney's bewilderment about the alleged hoax and Chamberlain's failure to apprise him of it, the ALJ sardonically responded, "Why, indeed? This claimant, contrary to the curious assertion by his attorney, is not mentally deficient. He is well aware such statements might bolster his claim." *Id.*

If Chamberlain, in fact, solicited false testimony of his relatives to bolster his claim, I would disallow his claim for that reason alone. The ALJ, however, took no steps to verify the accuracy of the report but chose instead to discredit Chamberlain through double, unverified hearsay.

Were it not for the allegation that Chamberlain solicited false testimony, I would promptly remand the case to the Secretary with directions to award benefits to Chamberlain. Dr. Domingo's testimony is largely

unrefuted and, along with the vocational expert's testimony, clearly calls for an award of benefits to Chamberlain. The record, however, is clouded by the unverified and unproven allegation that Chamberlain bolstered his claim by soliciting false statements. In spite of my firm conviction that Chamberlain is not capable of performing any work in the local or national economies, until this allegation is properly investigated, it would be precipitous to award benefits. I therefore would remand to the Secretary with directions to reassign the case to an ALJ other than Thomas A. Donahue with directions to rehear the case in its entirety and to make new findings. On remand the new ALJ would be required to determine the truth or falsity of the alleged telephone call by Chamberlain's relative. In no other way can the integrity of the social security process be guaranteed and justice be realized for both the claimant and the government.