# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 06-3841

———————

Patricia A. Casey,

        Appellant,

      v.

Michael J. Astrue,[1] Commissioner
of the Social Security Administration,

        Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Southern District of Iowa.
\*
\*
\*
\*

———————

Submitted: September 28, 2007
Filed: October 4, 2007

———————

Before BENTON, BOWMAN, and SHEPHERD, Circuit Judges.

———————

BOWMAN, Circuit Judge.

Patricia Casey's applications for disability insurance benefits and supplemental security income benefits were denied by the Social Security Administration (SSA). Casey sought review before an administrative law judge (ALJ), who, after conducting a hearing, concluded that Casey was not disabled and denied the benefits. The SSA Appeals Council denied review, thereby rendering the ALJ's decision the final agency

———————

[1]Michael J. Astrue has been appointed to serve as Commissioner of the Social Security Administration and is substituted as Appellee pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure.

determination. Casey sought review in the District Court,[2] which affirmed the decision of the agency. Casey appeals, and we affirm.

I.

Casey's applications for benefits alleged that she became disabled and unable to work on June 11, 2002, due to fibromyalgia, back pain, leg pain, depression, and other impairments. On the alleged onset date, she was 40 years old, had a 12th-grade education, and had completed a secretarial training course. She had previously worked as an administrative assistant, employment clerk, program manager, cashier, and waitress.

The ALJ evaluated Casey's disability claim under the sequential analysis prescribed by the Social Security regulations. See 20 C.F.R. § 404.1520. First, the ALJ found that Casey was not engaged in substantial gainful activity. Second, the ALJ concluded that Casey was severely impaired by the combination of "fibromyalgia, status post left knee surgery, back pain secondary to past compression fracture and depression." J.A. at 9. At the third step, the ALJ determined that Casey's impairments did not meet or equal any of the impairment listings that create a presumption of disability. Thus, the ALJ continued to the fourth step, where she considered Casey's residual functional capacity (RFC)[3] and past relevant work. The ALJ determined that Casey had the RFC to perform work "with the following limitations: occasionally lift ten pounds, frequently lift less than ten pounds, sit a total of six hours in an eight hour day, stand/walk at least two hours in an eight hour day and occasionally climb, balance, stoop, kneel, crouch and crawl." Id. at 13. The ALJ

---

[2]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

[3]RFC is defined as the most an individual can do despite the combined effects of her impairments. 20 C.F.R. § 494.1545.

-2-

concluded that even with these limitations, Casey could return to her past work as an employment clerk, administrative assistant, or program manager. Id. at 15. Because Casey's impairments did not prevent her from doing her past relevant work, the ALJ found that Casey was not disabled and, thus, not entitled to benefits. The District Court affirmed that decision.

## II.

On appeal, Casey contends that the District Court committed reversible error in affirming the ALJ's decision because the ALJ (1) gave improper weight to medical opinions in the record, (2) improperly discredited Casey's subjective complaints of pain, and (3) erred in determining Casey's RFC. We review de novo the District Court's decision affirming the agency's denial of benefits. Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007). In conducting this review, we consider whether the ALJ's decision is supported by substantial evidence on the record as a whole. Id. "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007). We will not disturb the denial of benefits so long as the ALJ's decision falls within the available "'zone of choice.'" Id. (quoting Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006)). "An ALJ's decision is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." Id.

## A.

Casey first contends that the ALJ improperly weighed the medical evidence in determining that she was not disabled. In particular, Casey argues that the ALJ gave too little weight to the opinions of physicians that treated and examined her and too much weight to the opinion of a physician who performed a paper review of the medical records.

The ALJ had a duty to evaluate the medical evidence as a whole. See Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). While a "'treating physician's opinion is generally entitled to substantial weight[,] . . . such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data.'" Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (quoting Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994)); see also 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000) (quotation and citation omitted). In considering how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations. 20 C.F.R. § 404.1527(d)(2)(i).

According to Casey, the ALJ's "most outrageous error" was the failure to credit the testimony of Lawrence Rettenmaier, M.D., the rheumatologist who treated Casey's fibromyalgia. Appellant's Br. at 25. Initially, it is important to note that contrary to Casey's suggestion, the ALJ did not reject all of Dr. Rettenmaier's opinions. The ALJ discussed and gave weight to Dr. Rettenmaier's treatment records of December 2001 to May 2004. The ALJ only refused to give weight to Dr. Rettenmaier's opinion expressed in a Fibromyalgia RFC Questionnaire completed in July 2004. In the RFC Questionnaire, Dr. Rettenmaier simply discussed his ultimate conclusions about Casey's limitations, specifically, that Casey could sit for fifteen to twenty minutes at a time, for a total of less than two hours in an eight-hour day; could stand for five to ten minutes at a time, for a total of less than two hours in an eight-hour day; would need unscheduled breaks during the workday; and would miss three or more days of work per month due to the severity of her symptoms. The ALJ characterized this

opinion as "quite conclusory, providing very little explanation of the evidence relied on in forming the opinion as to why the claimant was so limited." J.A. at 12. The ALJ further found that although Dr. Rettenmaier did have a treating relationship with Casey, the record revealed that the actual treatment visits were infrequent.

We will discuss the ALJ's determination of Casey's RFC in Part II.C of this opinion. At this point, however, we note that substantial evidence supports the ALJ's refusal to give the opinion of Dr. Rettenmaier controlling weight. As we have stated, a treating physician's opinion is entitled to controlling weight only to the extent that it is consistent with medically acceptable clinical or laboratory diagnostic data. See Pena, 76 F.3d at 908; 20 C.F.R. § 404.1527(d)(2); Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999). Our review of the medical records convinces us that Dr. Rettenmaier's opinion lacks such consistency. On December 7, 2001, Dr. Rettenmaier saw Casey for the first time in "several years." J.A. at 174. A physical examination on that date indicated that Casey had "widespread soft tissue tender points," id. at 175, but also stated that Casey reported doing "reasonably well in the last several years" with her fibromyalgia, id. at 174. Casey had a "full range of motion of the neck, shoulders, elbows, wrists, and hands," and "no pain with range of motion of the hips." Id. at 175. Casey did not see Dr. Rettenmaier again until January 16, 2003. At that time, Casey's soft-tissue tender points remained and she had crepitus (crackling) at the knee, but her straight leg raise was negative. She had tenderness in her lower back, but her thoracic back pain was stable. Dr. Rettenmaier recommended exercise and a nonsteroidal drug. On February 12 and 20, 2003, Dr. Rettenmaier treated Casey's left knee with an injection of osteoarthritis medication. Casey did not see Dr. Rettenmaier again for over a year. On May 17, 2004, Dr. Rettenmaier conducted a physical examination and noted that Casey had some "almost touch-me-not type pain in the lower extremities about her knees," but that "[s]he does not really have that widespread finding." Id. at 279. His report also noted that Casey had "widespread soft tissue tender points." Id. at 280.

The ALJ discussed the reports of other treating physicians, whose diagnoses of Casey's health were more favorable than that of Dr. Rettenmaier. Casey was treated by Jill Meilahn, D.O., in 2001 and 2002 for back and neck pain. An x-ray taken on February 28, 2001, showed Casey's "old vertical fracture through the T12 centrum" (injured in 1989), but indicated that the "thoracic and lumbar discs are well hydrated," "[n]o disc herniation," "[n]o marrow lesion," and "[n]o facet arthritis." Id. at 137. To treat Casey's pain, Dr. Meilahn recommended physical therapy, exercise, and epidural steroid injections. On September 6, 2002, Dr. Meilahn noted that Casey was "helped substantially" by trigger point injections. Id. at 214. An x-ray taken on December 10, 2002, revealed a "[n]ormal lumbar spine." Id. at 164. On December 16, 2002, a physical therapist noted that Casey suffered from sciatica and lower back pain, but anticipated improvements "with increase in activity and exercise as appropriate." Id. at 165.

Casey began seeing Scott Meyer, M.D., for knee pain in April 2003. On August 14, 2003, Dr. Meyer performed osteotomy surgery on Casey's left knee. On February 13, 2004, Casey reported that she was "much improved from where she was prior to her surgery" and "overall happy with the results of the surgery"; she reported only occasional soreness in her knee from using stairs or being bumped by her Saint Bernard. J.A. at 196. A physical examination on that date showed that Casey's "[p]atella tracking appears to be good," and that she could "do a straight leg raise without difficulty." Id. Casey had "a little bit of quad atrophy present," which Dr. Meyer attributed to Casey "not being real consistent with her exercises" due to other health problems. Id. Significantly, Dr. Meyer cleared Casey to "return to her activities" without restriction. Id. We also note that an x-ray taken of Casey's knees on July 3, 2002, showed "[n]ormal knees," with no "effusion, fracture or dislocation." Id. at 136.

In addition to contrasting Dr. Rettenmaier's opinion with the medical records of other treating physicians, the ALJ appears to have discounted the opinion based on

the infrequent nature of the treatment visits.  See 20 C.F.R. § 404.1527(d)(2)(i).  Dr. Rettenmaier saw Casey for the first time in "several years" on December 7, 2001.  J.A. at 174.  Thereafter, he treated her far less frequently than one would expect based on the pain that Casey alleges.  See Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (concluding that failure to seek regular medical treatment is inconsistent with complaints of disabling pain).  Given the sporadic nature of the treatment relationship and the dearth of clinical or laboratory diagnostic data to support Dr. Rettenmaier's conclusory opinion, we hold that the ALJ acted within the acceptable zone of choice in declining to give Dr. Rettenmaier's opinion controlling weight.  See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (ruling that an ALJ may give a treating physician's opinion limited weight when it provides only conclusory statements).

Next, Casey challenges the limited weight that the ALJ gave to the opinion of consulting examiner Shawn Richmond, M.D.  Dr. Richmond examined Casey in September 2002.  He noted in his report that Casey complained of neck, shoulder, and knee pain and that she reported experiencing "much discomfort in her back" when she performed work that required her to "sit in one place or do any kind of lifting."  J.A. at 138.  Dr. Richmond's physical examination of Casey revealed some reduced range of motion in her shoulders, left cervical spine, and hips, but normal range of motion overall.  Dr. Richmond opined that Casey's fibromyalgia and chronic back problems "would interfere with work requiring her to do any lifting and carrying of any substantial weight."  Id. at 139.  He further concluded that Casey would "have difficulties with standing, moving about, walking, [and] sitting in over an 8 hour work day" and "with stooping, climbing, kneeling, and crawling."  Id.  The ALJ discounted Dr. Richmond's opinion as conclusory and not based on objective diagnostic data.  As explained by the ALJ, Dr. Richmond "relied largely on the claimant's subjective report of symptoms and limitations and seemed to uncritically accept most of her allegations as true."  Id. at 10.  The ALJ noted that Dr. Richmond did not elaborate on his conclusion that Casey would have difficulty performing work duties in a normal day. As we discussed above, conclusory opinions not backed by medically acceptable

-7-

clinical and laboratory diagnostic data carry limited weight in the disability analysis. Our review of the record indicates that Dr. Richmond's opinion is not consistent with the objective medical evidence. Moreover, while Dr. Richmond stated that Casey would have "difficulties" with certain activities, he did not opine that Casey would be unable to perform these activities. We therefore hold that in analyzing the medical evidence as a whole, the ALJ appropriately discounted Dr. Richmond's opinion.

Casey also takes issue with the ALJ's reliance on the report of John May, M.D., an Iowa Disability Determination Services physician who reviewed the medical evidence in October 2002. Dr. May noted: "MRI of the thoracic spine reveals no evidence of spinal stenosis. She has end of range of motion restriction of the cervical and lumbar spine . . . . She has generalized tenderness in both recognized tender points and control points." Id. at 195. He concluded, however, that "her alleged level of impairment is not supported by significant positive physical findings." Id. Although Dr. May found Casey's impairments to be severe, he believed that she was capable of working within limits that he outlined in an RFC. Casey complains that Dr. May's review was "premature" because he did not have access to later diagnoses by Drs. Rettenmaier and Richmond. Appellant's Br. at 24. Our review of the record shows that Dr. May's October 23, 2002, report was consistent with the medical evidence as of that date. The later reports of Dr. Rettenmaier and Dr. Richmond were not entitled to significant weight, as we discussed above. The ALJ did not err in considering the opinion of Dr. May along with the medical evidence as a whole.[4]

Finally, Casey challenges the ALJ's interpretation of a consultative psychological evaluation performed by Dr. Jerald Catron, Ph.D., in September 2002. Dr. Catron noted that Casey was "preoccupied with physical symptoms" of pain, but found that she had no other psychological problems or evidence of a

---

[4] To the extent that Casey argues that the ALJ's denial of disability was based solely on Dr. May's report, her argument is not supported by the record.

psychopathological condition. J.A. at 144. He stated that "[h]er history and behavior indicate that she has the ability to remember and understand instruction, procedures, and locations"; that she displayed "no indication of problems with attention, concentration, and pace"; that she "displayed adequate social skills"; and that "[t]he intensity of her affective display was not congruent with her statements about depression." Id. He noted, however, that Casey "regards her physical problems as making her unable to work because of pain." Id. Dr. Catron ultimately diagnosed Casey with "pain disorder associated with both psychological factors and her general medical condition" and concluded that "[i]t is very *likely* that the pain disorder is so impairing that she is unable to work." Id. (emphasis added). Dr. Catron did "not find any significant limitations in work-related activities from mental illness other than the pain disorder." Id. at 145. The ALJ reviewed Dr. Catron's report and appears to have relied on it to some extent in determining that Casey was not disabled. In so doing, the ALJ misquoted Dr. Catron as stating that it was "very *unlikely*" that Casey's pain disorder would prevent her from working. Id. at 11 (emphasis added). We agree with Casey that the ALJ incorrectly recounted Dr. Catron's ultimate conclusion regarding her ability to work. This mistake is without consequence, however, because the value of a medical source's opinion is found in "judgments about the nature and severity" of a claimant's impairments; a medical source's conclusions that a claimant is "'disabled' or 'unable to work'" are "not give[n] any special significance" because such dispositive findings are reserved to the ALJ. 20 C.F.R. § 404.1527(a)(2) & (e)(1),(3). The ALJ correctly recounted Dr. Catron's opinions about Casey's functional limitations. Viewing Dr. Catron's report in the context of the whole record, we find that substantial evidence supports the ALJ's determination that Casey was not disabled.

B.

Casey's second argument on appeal is that the ALJ erred in finding her statements about the intensity and severity of her symptoms "not fully credible." J.A. at 14. In Polaski v. Heckler, we noted several factors that an ALJ must consider in evaluating a claimant's subjective complaints. 739 F.2d 1320, 1322 (8th Cir. 1984) (per curiam order). In addition to objective medical evidence, an ALJ must examine "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to . . . 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions." Id. While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). The ALJ may discount subjective complaints of pain if they are inconsistent with the evidence as a whole. Polaski, 739 F.2d at 1322.

The ALJ properly identified the Polaski factors and considered evidence relevant to those factors. The ALJ ultimately found that Casey's subjective complaints of pain were inconsistent with medically objective evidence and the observations of third parties. The ALJ's analysis of the medical evidence has been discussed above. Regarding the observations of third parties, the ALJ began by considering a Third Party Adaptive Functioning Questionnaire completed by Casey's mother. In it, Casey's mother indicated that Casey had good communication and social skills, had good functional academic skills, and engaged in significant independent activity. The ALJ found this report inconsistent with Casey's allegations of disabling pain, difficulty with concentration, and limited activities. Casey does not challenge the truth of her mother's answers in the questionnaire but, rather, argues that the questionnaire does not address all of her subjective complaints. While Casey's

assertion may be correct, it is of no consequence.  It was certainly within the ALJ's discretion to consider the questionnaire in addition to other evidence in the record.

The ALJ also considered a Work Performance Assessment from Casey's former employer.  In it, the employer stated that he considered Casey's performance adequate and consistent, and that he would rehire her if an appropriate position became available.  Casey argues that the ALJ's assessment of the employer's report is distorted.  Our examination of the report shows that, as Casey asserts, the employer noted that he accommodated Casey's limitations by permitting her to work four days a week, not assigning her to certain tasks, and allowing her to take additional days off "[m]any weeks" for "medical reasons." J.A. at 70.  The employer stated, however, that he knew of no other limitations preventing Casey from engaging in competitive, full-time work.  He ranked Casey's performance as "adequate," "good," or "excellent" in all areas.  Id. at 69.  And, as noted by the ALJ, he affirmed that he would rehire Casey.  While reasonable minds could differ on the import of the employer's report, we conclude that the report adequately supports the ALJ's assessment.

With regard to daily activities, the ALJ noted that Casey prepared supper for her family, drove locally, visited her parents' house several times weekly, attended a bible study, and worked on the computer.  Casey also testified that she was able to camp with her husband, swim, and paint ceramics.  Moreover, the medical records frequently reference Casey's active lifestyle.  See, e.g., J.A. at 125 (noting that Casey dropped a heavy ceramic tile on her foot while she was remodeling), 129 (noting that Casey reported back pain and headache that began after "helping to lay carpet"), 135 (Casey reported spending "hours on the internet" at home), 174 (noting that Casey's knee pain had flared up, possibly because she had been "laying carpet and doing some other physical activities at home"), 185 (diagnosing "sciatica with low back pain" after Casey "lift[ed] something heavy"), 205 (reporting that Casey's knees were bothering her after she rode a jet ski).  While Casey's ability to perform these activities does not disprove disability as a matter of law, "[i]nconsistencies between subjective

complaints of pain and daily living patterns may . . . diminish credibility." Pena, 76 F.3d at 908; see also Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for eleven-year-old child, driving, fixing simple meals, doing housework, and shopping for groceries held to be "extensive daily activities" that did not support claimant's alleged inability to work); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (playing cards, watching television, shopping, performing occasional housework, and driving children and wife held inconsistent with disabling pain).

The ALJ is responsible for deciding questions of fact, including the credibility of a claimant's subjective testimony about her limitations. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Id. at 714; see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) ("We will not disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain."). Here, the ALJ pointed to substantial evidence in the record supporting her decision to discount Casey's subjective allegations. We therefore defer to the ALJ's credibility finding.

## C.

Casey's final argument is that the ALJ erred in determining her RFC. "The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004); see also 20 C.F.R. § 404.1545(a) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."). While the ALJ must consider all of the relevant evidence in determining a claimant's RFC, the RFC is ultimately a medical question that must find at least some support in the medical evidence of record. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004).

The ALJ determined that Casey had the RFC to perform work with the following limitations: "occasionally lift ten pounds, frequently lift less than ten pounds, sit a total of six hours in an eight hour day, stand/walk at least two hours in an eight hour day and occasionally climb, balance, stoop, kneel, crouch and crawl." J.A. at 15. The ALJ stated that this determination was based generally on the report of Dr. May and "other subjective evidence of record." Id. at 13. The ALJ further stated that Dr. May's opinion was well supported and not inconsistent with the medical evidence in the record as a whole.

Casey argues that the ALJ's RFC determination is inconsistent with her testimony, daily activity report, and medical evidence. According to Casey, if the ALJ had fully credited the opinions of Drs. Rettenmaier, Catron, and Richmond, and had not discounted Casey's testimony and subjective complaints of pain, then the ALJ would have determined Casey's RFC to be incompatible with the ability to work. As we discussed above, however, the ALJ did not err in her evaluation of the medical evidence or in discounting Casey's subjective complaints. Casey challenges the ALJ's reliance on Dr. May's RFC opinion, directing us to Nevland v. Apfel where we reversed an ALJ's decision because he relied on the opinions of nontreating, nonexamining physicians in determining the claimant's RFC. 204 F.3d 853, 858 (8th Cir. 2000). But as we recognized in Eichelberger v. Barnhart, Nevland addressed the evidence necessary to satisfy an ALJ's burden of proof at step five in the disability analysis; Nevland does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work. 390 F.3d 584, 591 (8th Cir. 2004); see also Masterson, 363 F.3d at 737–39 (holding that the ALJ properly relied on the assessments of a nonexamining physician, and not claimant's treating physicians, in determining the RFC at step four). "It is well settled that an ALJ may consider the opinion of an independent medical

-13-

advisor as one factor in determining the nature and severity of a claimant's impairment." Harris, 356 F.3d at 931.[5]

Our review of the record shows that the ALJ's RFC determination is supported by Dr. May's report, other medical evidence, and the subjective reports of Casey's mother and former employer. We thus affirm the ALJ's determination of Casey's RFC.

## III.

Overall, substantial evidence in the record supports the ALJ's determination that Casey's impairments did not inhibit her ability to perform her past relevant work and that Casey therefore was not disabled. Accordingly, we affirm.

_____

[5]Casey also suggests that Dr. May might have been unaware of the fibromyalgia tender points identified by Drs. Rettenmaier and Richmond. Dr. May's report acknowledges, however, that Casey suffers from fibromyalgia and "has generalized tenderness in both recognized tender points and control points." J.A. at 195.