# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1954

_____

| | | |
|---|---|---|
| Belinda Smith, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| Jo Anne B. Barnhart, Commissioner, | * | |
| Social Security Administration, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: December 16, 2005
Filed: January 31, 2006

_____

Before WOLLMAN, LAY, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Belinda Smith (Smith) appeals the district court's order upholding the Commissioner of the Social Security Administration's (Commissioner) denial of supplemental security income (SSI) benefits. For the reasons set forth below, we reverse and remand to the Commissioner for further proceedings.

## I. BACKGROUND

Smith was born in 1973 and has a high school education. In March 2001, Smith applied for SSI benefits, claiming she was disabled due to migraine headaches, chronic obstructive pulmonary disease, irritable bowel syndrome, pelvic inflammatory disease, arthritis, strokes, asthma, endometriosis, blood clots, and an injured back and neck.

On December 12, 2002, the Administrative Law Judge (ALJ) held a hearing on Smith's application for SSI benefits. Smith was not represented by counsel at the hearing. Smith testified she last worked as a certified nursing assistant in a nursing home, but she could no longer work due to three migraine-induced strokes, the first of which occurred in 1994. Smith further testified that as a result of a car accident in June 2001, she suffered from thoracic outlet syndrome and her doctor advised her to lift no more than five to ten pounds. Smith also complained that when the weather changed, "the arthritis had set up in my joints," and, on some days, she had problems walking. Smith had trouble standing and walking due to endometriosis, pelvic inflammatory disease, and a prolapsed uterus. Smith also had breathing problems associated with chronic obstructive pulmonary disease. Because of her difficulty breathing, Smith took updrafts from inhalers every four hours and had a handicapped parking permit. Despite being advised by her doctors to quit smoking, Smith continued to smoke, although at a reduced rate, stating smoking calmed her depression and nerve problems. Smith also suffered from panic attacks and took Paxil.[1]

Smith further testified she was disabled due to a seizure disorder. Smith suffered from seizures as a child, and the seizures started again shortly before the ALJ

---

[1]Paxil is a psychotropic drug used for the treatment of depression and anxiety. *Physicians' Desk Reference* 1501 (60th ed. 2006).

hearing. Smith took Dilantin[2] three times per day for seizures, and her doctors continued to adjust her Dilantin levels. Due to her seizures, Smith's doctors advised Smith not to use the stove and not to drive for one year. Smith had not driven since September 2002.

Smith also described her daily activities and capabilities, stating she tried to "pick up around the house," and she tried to "craft sometimes." Smith also visited her grandmother and aunt, attended church occasionally, read, and shopped for short periods.

Jerry Miller (Miller), a vocational consultant, also testified at the hearing before the ALJ. Miller explained Smith's past work consisted of a position as a certified nursing assistant, which was medium exertion, semi-skilled work. The ALJ then asked Miller the following hypothetical question:

> Assume you're dealing with someone the same age as the claimant, with the same education, and background of past work experience. Further assume that they're limited to light work exertionally. They would also have to observe routine seizure precautions, such as avoiding dangerous heights, machinery, all operation of automotive equipment, that sort of thing. They would also have to avoid exposure to dust, fumes, gases, other pulmonary irritants. Now with that vocational profile, would this individual be able to perform any of the claimant's past jobs?

Miller replied this hypothetical individual could not perform Smith's past work. The ALJ then asked Miller whether the hypothetical individual could perform other jobs in the national economy. Miller responded this hypothetical individual could work as a cashier (for which there were 20,000 jobs in Arkansas and over one million in the national economy), an office helper (for which there were 1,000 jobs in Arkansas and

---

[2]Dilantin is an antiepileptic medication used for the control of grand mal and temporal lobe seizures. *Physicians' Desk Reference* 2153 (60th ed. 2006).

over 50,000 in the national economy), and as a sales attendant (for which there were 900 jobs in Arkansas and over 50,000 in the national economy), all of which were light exertion, unskilled work.

At the end of the hearing, the ALJ advised Smith he would send her to a consultative examiner to further develop her case. On January 27, 2003, Dr. Owen H. Clopton (Dr. Clopton) performed a consultative examination. Dr. Clopton's physical examination of Smith revealed Smith suffered from obesity, but had no limitation of motion, no cyanosis, no edema, and no muscular atrophy, and had normal strength in both the upper and lower extremeties. Dr. Clopton's pulmonary functions test showed mild restriction. Dr. Clopton diagnosed Smith with recurrent bronchitis, hypertension, migraine headaches, mixed anxiety depression, uncontrolled seizure disorder by history, and exogenous obesity.

On January 30, 2003, Dr. Clopton completed a medical assessment, indicating due to dyspnea and cough, Smith could lift twenty pounds occasionally and ten pounds frequently, she could stand/walk for at least two hours in an eight-hour work day, but she had no restrictions on sitting, pushing, or pulling; due to obesity and dyspnea, she could perform occasional climbing, balancing, kneeling, crouching, crawling, and stooping; she had no restrictions on manipulative functions and no visual or communicative limitations; due to frequent bronchitis, she had a limited ability to work around temperature extremes, dust, humidity/wetness, fumes, odors, chemicals, and gases; but she had no restrictions on working around noise, vibration, or hazards, such as heights and machinery.

On February 19, 2003, Smith visited Dr. Bob W. Smith (Dr. Smith), a neurologist at the Bald Knob Medical Clinic, complaining of increased seizure activity. Dr. Smith assessed Smith as having uncontrolled grand mal epilepsy, obesity, and mental depression. In a letter dated February 19, 2003, Dr. Smith advised Smith's treating physician, Dr. Terry Brown (Dr. Brown), that Smith experienced

seizures on almost a daily basis, with tonic-clonic jerking with tongue biting, and postictal confusion. Dr. Smith noted Smith was obese, but her motor strength was symmetrical, sensation was intact, coordination was good, and her gait was not ataxic.

Dr. Smith ordered an electroencephalogram, which revealed normal interseizure recordings, and an MRI, which revealed no intracranial lesions but did show Smith had right maxillary sinusitis. Smith's Dilantin level was 3.9, well below the therapeutic range of 10-20. Dr. Smith diagnosed Smith with grand mal epilepsy and advised Smith to (1) decrease Paxil, because Paxil tended to worsen seizure activity, (2) continue taking Dilantin, and (3) add Depakote.[3]

On March 12, 2003, Smith followed up with Dr. Smith on her seizure activity. Dr. Smith noted Smith voluntarily stopped taking Paxil and she experienced less frequent, but more intense, seizures. Dr. Smith assessed Smith with uncontrolled seizure disorder and increased Smith's Dilantin dosage.

In a decision dated May 17, 2003, the ALJ found Smith suffered from severe impairments, including a history of back strain, seizures, and mild chronic obstructive pulmonary disease, but Smith did not have an impairment or combination of impairments that met or equaled a listed impairment for presumptive disability. The ALJ also found Smith could not perform her past relevant work. The ALJ determined, however, "the symptomatology suffered by [Smith] is not of a duration, frequency or intensity as to be disabling nor would it preclude the performance of light work." The ALJ further noted no physician limited Smith's ability to work due to her seizure disorder. Thus, the ALJ found Smith had the residual functional capacity to perform light work and denied Smith's request for benefits. The Social Security Appeals

---

[3]Depakote is indicated for the treatment of seizures and migraine headaches. *Physicians' Desk Reference* 429 (60th ed. 2006).

Council and the district court both affirmed the ALJ's decision. Smith appeals the district court's order upholding the Commissioner's decision to deny SSI benefits.

## II.  DISCUSSION

Smith argues the Commissioner's decision denying her disability claim is not supported by substantial evidence. Our review is limited to determining "whether the Commissioner's findings are supported by substantial evidence on the record as a whole." Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). That duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. Id.

The ALJ undertook the familiar five-part analysis in determining whether Smith is disabled,[4] finding at the fifth step she was not, because she has the residual functional capacity to perform light work. The Commissioner bears the burden at the fifth step of establishing that, given the applicant's residual functional capacity, age, education, and work experience, there are a significant number of jobs available in the national economy which the applicant can perform. 20 C.F.R. § 404.1560(c). Smith raises two issues on appeal. First, she claims the ALJ's hypothetical question to Miller was deficient because it failed to include any limitation on Smith's ability to stand, or the frequency and severity of Smith's seizures. Second, Smith argues the ALJ failed to fully develop the record.

---

[4]"The five part test is as follows: 1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not, 5) whether the claimant can perform any other kind of work." Cox v. Barnhart, 345 F.3d 606, 608 n.1 (8th Cir. 2003).

The ALJ's conclusions are not supported by substantial evidence in the record. Specifically, the record is underdeveloped concerning Smith's seizure disorder. In his decision, the ALJ concluded "the symptomatology suffered by [Smith] is not of a duration, frequency or intensity as to be disabling nor would it preclude the performance of light work." Only five days before the ALJ's decision, however, Smith's treating neurologist, Dr. Smith, noted Smith experienced more intense seizures, and Dr. Smith diagnosed Smith with uncontrolled seizure disorder and increased her Dilantin dosage. Despite the ALJ's reference to the "duration, frequency or intensity" of Smith's seizures, the ALJ did not question Smith's treating physicians or the consultative examiner about the frequency, severity, or controllability of Smith's seizures. Additionally, the ALJ noted no physician limited Smith's ability to work due to her seizure disorder. The ALJ, however, did not ask Smith's treating physicians whether Smith's seizure disorder may limit her ability to work. Given Smith's order from her physicians not to use the stove and not to drive for one year due to her seizure disorder, if asked, Smith's physicians may believe Smith has a limited ability to work as well. The ALJ did not focus on the seizure disorder with the consultative examiner, Dr. Clopton, and also did not inquire of Dr. Clopton regarding Smith's recent, more intense, and possibly more uncontrolled seizures.

We remand the case for further proceedings so the ALJ may further develop the record in order to ascertain what level of work, if any, Smith is able to perform. See Greene v. Sullivan, 923 F.2d 99, 102 (8th Cir. 1991) (remanding for further development of the record where claimant suffered from several seizures and claimant's neurologist suggested occupational limitations based on claimant's propensity to seizures). On remand, the ALJ should consider the extent of Smith's impairment from seizures in evaluating Smith's residual functional capacity, and, if the evidence warrants, frame a revised hypothetical question to the vocational expert.

## III.  CONCLUSION

We reverse the judgment of the district court and remand with instructions to return the case to the Commissioner for proceedings consistent with this opinion.

_____