# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2289

_____

Amy Samons,

        Appellant,

v.

Michael J. Astrue, Commissioner of
the Social Security Administration,

        Appellee.

\* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
Eastern District of Arkansas.

_____

Submitted:  November 16, 2006
Filed: August 13, 2007

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Amy Samons filed a claim for disability benefits and supplemental security income.  She appeals the judgment of the district court[1] upholding the decision of the Social Security Administration denying her claim.  We affirm.

---

[1]The Honorable J. Thomas Ray, United States Magistrate Judge for the Eastern District of Arkansas, sitting by consent of the parties. *See* 28 U.S.C. § 636(c); *see also* Fed.R.Civ.P. 73.

After the Social Security Administration denied Ms. Samons benefits initially, an administrative law judge conducted a hearing. The ALJ then concluded that Ms. Samons was able to perform her past relevant work and denied her claims. The Appeals Council denied review after considering additional medical evidence that Ms. Samons had submitted, and the ALJ's decision thus became the final decision of the SSA. Ms. Samons unsuccessfully challenged that decision in the district court. On appeal, she contends that the ALJ erred in three respects: by failing to give adequate weight to her treating physician's opinion, by improperly assessing her credibility, and by failing to consider the duties of her past relevant work before deciding that she could do it.

I.

We review the district court's decision *de novo*, *see Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir.2000), to determine whether the ALJ's decision is supported by substantial evidence on the record as a whole and whether it complies with the relevant legal requirements. *See id.*; *see also* 42 U.S.C. § 405(g). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's decision." *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). In determining whether the decision is adequately supported, we consider evidence that detracts from that decision, as well as the evidence supporting it. *Id.*

Following the SSA's five-step process, *see* 20 C.F.R. § 404.1520, the ALJ first determined that Ms. Samons had not been engaged in "substantial gainful activity" since February, 2002. He then decided that she had a severe impairment (an impairment or combination of impairments that "significantly limit[ed]" her ability "to do basic work activities," *see* 20 C.F.R. § 404.1520); the ALJ described Ms. Samons as having *i.e.*, a "severe history of chronic back pain, a history of seizure activity," asthma, "a hiatal hernia, gastroesophageal reflux, headaches, and intermittent depression." At step three, the ALJ concluded that Ms. Samons's impairments did not meet or equal any of the listings that create a presumption of disability. *See* 20 C.F.R.

§ 404.1520(d).  He denied Ms. Samons's claim at step four, after concluding that she was not disabled because she could perform her "past relevant work as a cook, baby sitter, house keeper, and cashier."  *See* 20 C.F.R. § 404.1520 (f).

## II.

Ms. Samons first maintains that the ALJ failed to give sufficient weight to the opinion of her treating doctor that she was unable to work because of her seizures.  Dr. Ronald Hollis, Ms. Samons's family physician, treated her in 2000; she was then treated by another physician until 2002, when she returned to Dr. Hollis's care. Ms. Samons was continuing treatment with Dr. Hollis at the time of the hearing in 2004.

Dr. Hollis diagnosed Ms. Samons with epilepsy (a seizure disorder), a diagnosis supported by her abnormal electroencephalography (EEG) results in 1994 and 2002. In Ms. Samons's medical chart, Dr. Hollis stated that she had both grand mal and petit mal seizures.  A grand mal seizure — also known as a tonic-clonic seizure — "features uncontrolled muscle spasms involving the entire body, and loss of consciousness. ... the person may clench the teeth, bite the tongue, and lose bladder control.  After the seizure passes, the person may fall into a deep sleep for an hour or more.  Usually, there is no recall of the seizure on waking up."  The Signet Mosby Medical Encyclopedia (rev. ed. 1996) at pp. 293-94.  According to testimony at her hearing, Ms. Samons's grand mal seizures lasted about five or six minutes and afterward she was tired, disoriented, and had muscle pain; it took her about two hours to recover.

Petit mal seizures (or absence seizures) "consist[] of a momentary break in consciousness of thought or activity, often accompanied by automatisms or clonic movements, especially of the eyelids."  Dorland's Illustrated Medical Dictionary at 1502, *as quoted in Flanery v. Chater*, 112 F.3d 346, 348 n.7 (8th Cir. 1997).  Ms. Samons's mother testified that numerous times she had observed her daughter stare for

a minute or two and then continue what she had been doing, sometimes seeming as if she was unaware that anything had happened. Dr. Hollis called these petit mal seizures, although Ms. Samons's neurologist, Dr. Demetrius Spanos, used the term "partial complex" seizures for what she described to him as "blank staring spells" that lasted "minutes."

Dr. Hollis wrote two opinion letters. On November 4, 2002, he wrote a letter "[t]o whom it may concern" stating that although Ms. Samons's seizures were "better controlled, she still has frequent daily episodes of staring and decreased awareness of her surroundings" and had been "instructed not to drive." He concluded that Ms. Samons was unable "to hold down any type of job secondary to seizures." In April, 2004, after Ms. Samons's hearing but before the ALJ's decision, Dr. Hollis wrote another letter. The beginning of second letter was virtually identical to the first, but this time he concluded by stating that Ms. Samons "should not work a full-time job schedule, as being over-stressed or over-tired may result in an increase of further symptoms or activity." The ALJ did not consider the second letter since Ms. Samons first submitted it to the Appeals Council after the ALJ denied her claim.

## A.

We address first Ms. Samons's contention that the ALJ failed to give the first letter adequate weight. A treating physician's opinion "regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Even if the opinion is not entitled to controlling weight, it "should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *see also* 20 C.F.R. §§ 404.1527, 416.927. But the ALJ may give a treating doctor's opinion limited weight if it provides conclusory statements only, *see Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir.1995), or is inconsistent with the record, *see Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ acknowledged the weight generally accorded a treating doctor's opinion, but he concluded for several reasons that Dr. Hollis's opinion was not entitled to such deference. He first stated that Dr. Hollis's opinion was "not consistent with the clinical and laboratory findings" and that there were "too many inconsistencies in this case."

Although the ALJ did not dispute that Ms. Samons had epilepsy, he questioned the frequency of her seizures. Dr. Hollis, in his somewhat cryptic letter, appeared to rely on his finding that Ms. Samons had "frequent daily episodes of staring and decreased awareness of her surroundings" (petit mal or partial complex seizures) to conclude that she could not work. The ALJ stated, in contrast, that Ms. Samons had said in February, 2003, that she had not had a seizure in four months, and that she had reported in January, 2001, that her last seizure was in 1999. Although we think that the ALJ used the term "seizure" here to mean grand mal seizures only, we note that Ms. Samons told Dr. Spanos that she had only two or three petit mal seizures and no grand mal seizures in the four months before February, 2003, and we cannot determine whether she had petit mal seizures between January, 2001, and 1999.

Ms. Hollis's medical records also included other statements regarding the frequency of her seizures that support the ALJ's finding of "inconsistencies" and his refusal to give substantial weight to Dr. Hollis's opinion. In 2000, Dr. Hollis said that Ms. Samons was stable on Tegretol," an anti-seizure medication. Although in June, 2002, he notes an increase in Ms. Samons's seizures in the "last month," she was out of Tegretol; he refilled her prescription and noted two weeks later that she was having "no more seizures." About a month later, she reported having had two or three petit mal seizures since her last visit, and on August 12, 2002, Ms. Samons told Dr. Hollis that she had had a seizure every day for two weeks. Dr. Hollis referred her to a neurologist, Dr. Spanos, who saw her for the first time in October. Not long after that, Dr. Hollis wrote the letter stating that Ms. Samons could not work.

But according to the record, Ms. Samons's seizures decreased the same month that Dr. Hollis wrote the letter. On her first visit to Dr. Spanos, he changed her medication, prescribing Topamax because her "partial complex seizures" seemed to be her primary problem; he continued her on Tegretol but stopped another seizure medication. As we have said, when Ms. Samons returned to see Dr. Spanos four months later, in February, 2003, she reported having had only two or three staring seizures and no grand mal seizures in the interim. The doctor increased her Topamax, hoping to decrease her staring seizures even further.

During the ten months between February and December, 2003, there are few references to Ms. Samons having seizures, except for a visit to the emergency room in April, when she reported difficulty breathing and seizure activity when she arrived at a hospital emergency room. The record shows that Dr. Spanos thought that an asthma attack caused the seizure activity; he did not think that Ms. Samons's medicine should be changed because of how well she had been doing and because a blood test showed that her Tegretol level was good. In mid-December, 2003, shortly before the hearing, Ms. Samons reported to Dr. Hollis that her seizures were increasing due to stress. At her hearing in January, 2004, Ms. Samons testified that she had two or three petit mal seizures per day and one or two grand mal seizures per week. We conclude that substantial evidence supported the ALJ's determination that Dr. Hollis's opinion was inconsistent with the record.

The ALJ also refused to give Dr. Hollis's opinion significant weight because his statement that Ms. Samons could not work was a conclusory opinion on the ultimate determination of disability, which is a question for the SSA, not a physician. *Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005). Though a treating doctor's opinion that the claimant cannot return to work, combined with other medical information, may assist an ALJ determining whether a claimant is disabled, *see, e.g., Bergmann v. Apfel*, 207 F.3d 1065, 1070-71 (8th Cir. 2000), such an opinion cannot resolve the issue, *see Chamberlain*, 47 F.3d at 1494. Here Dr. Hollis's opinion was

conclusory. He said that Ms. Hollis could not do any job, but he failed to explain how her seizures interfered with the performance of any job-related functions. Also, in November, 2002, Dr. Hollis's records already showed that Ms. Samons had significant periods without "daily frequent" petit mal seizures, but he did not mention that in his letter or explain how that related to his opinion that she could not work.

Finally, the ALJ stated that to require the SSA to accept the opinion of a treating doctor in all instances would be contrary to public policy because treating doctors sometimes allow their personal relationship with a claimant to affect that opinion. Though the ALJ did not specifically say so, he seemed to question Dr. Hollis's objectivity.

Because of conflicts in the evidence and medical records reflecting long periods during which Ms. Samons had few, if any, seizures, as well as the conclusory nature of the opinion, we conclude that the ALJ did not err by refusing to give significant weight to Dr. Hollis's opinion that Ms. Samons could not work.

## B.

Ms. Samons maintains, in the alternative, that if Dr. Hollis's opinion was inadequate, the ALJ had a duty to contact him for an explanation. As the ALJ recognized, the SSA does sometimes have a duty to develop the record, *Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000), and "[t]hat duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). But once an ALJ concludes, based on sufficient evidence, that the treating doctor's opinion is "inherently contradictory or unreliable," he or she is not generally required to seek more information from that doctor. *See Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006). Because we have already upheld the ALJ's decision not to give substantial weight to Dr. Hollis's opinion, we do not think that the ALJ had a duty to contact him.

We also note that the question of how frequently Ms. Samons had seizures was one of fact, and information regarding this issue was readily available to the ALJ from the records of Ms. Samons's treating doctors. These records record many of Ms. Samons's own reports of the number of seizures she was having. The ALJ relied on this information, as well as the opinions of two medical consultants, in determining the degree to which Ms. Samons's seizures affected her ability to perform work functions (RFC). Each of the consulting physicians completed a "Physical Residual Functional Capacity Assessment" for Ms. Samons. One of the doctors concluded in June, 2002, that Ms. Samons had only one limitation: she should "avoid even moderate exposure" to "Hazards (machinery, heights, etc.)" because of her seizures. Four months later, the other doctor determined her RFC, and his assessment differed only by concluding that Ms. Samons should "avoid all exposure" to the hazards, rather than avoiding "even moderate" exposure.

## C.

Finally, we reject Ms. Samons's contention that Dr. Hollis's second letter requires us to vacate the decision denying her claim. Because Dr. Hollis's April, 2004, letter was considered by the Appeals Council before it declined review, that letter is part of the record that we review to determine whether the ALJ's decision is supported by substantial evidence. *Kitts v. Apfel*, 204 F.3d 785, 786 (8th Cir.2000); *see also* 20 C.F.R. § 404.970(b).

Despite the medical records that we have recited indicating that Ms. Samons had had significant periods with few or no seizures since Dr. Hollis wrote his first letter in November, 2002, he begins his April, 2004, letter with the same statement: Although Ms. Samons's seizures were "better controlled, she still has frequent daily episodes of staring and decreased awareness of her surroundings" and had been "instructed not to drive." We thus conclude that the ALJ's determination that the first letter was inconsistent with the record applies with at least as much force to the second letter. And we believe that the inconsistency detracts from the weight of the doctor's

conclusion that stress and fatigue caused by full time work "may" cause her seizures to increase. Although this time Dr. Hollis's conclusion is a medical one, it is again cursory. Having carefully reviewed the record, including evidence submitted for the first time to the ALJ, we conclude that the ALJ's decision regarding the degree to which Ms. Samons was affected by her seizure disorder was supported by substantial evidence on the record as a whole.

## III.

Ms. Samons contends that the ALJ erred in finding that her testimony was not credible without considering the "factors" outlined in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984). Under *Polaski*, *id.*, a claimant's subjective complaints may not be rejected based solely on the lack of an "objective medical basis" for them. The ALJ must also examine "the claimant's prior work record and observations of third parties and physicians relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007). These considerations should be taken into account, although we have not required the ALJ's decision to include a discussion of how every *Polaski* "factor" relates to the claimant's credibility. *See Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir.2004).

Here the ALJ mentioned the *Polaski* requirements, and he noted Ms. Samons's daily activities, including the seven hours per week that she worked as a housekeeper at a nursing home. He also stated that she had no side effects from her medications, which is supported by her testimony, and that despite her testimony regarding the limitations caused by her back pain, her physicians had not mentioned any functional limitations. The ALJ also noted contradictions between her hearing testimony and her statements as recorded in her medical records. The ALJ noted too an inconsistency about whether she was permitted to drive; although Dr. Hollis's records reflect that he told her not to drive, she testified at the hearing that she drove and had not been told

not to. Ms. Samons testified at her hearing that she had two or three petit mal seizures each day, and about one or two grand mal seizures each week. As the ALJ noted, these statements conflicted with her own statements in her medical records, as well as some statements on her social security forms.

We find no merit to Ms. Samons's contention because we conclude that the ALJ sufficiently addressed the *Polaski* considerations and provided good reasons supported by substantial evidence for not fully accepting her subjective complaints, *see Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007).

IV.

Finally, Ms. Samons maintains that the ALJ did not adequately examine the duties of her past relevant employment as a cook, babysitter, housekeeper, and cashier before concluding that she was able to do that work based on her RFC. We agree that the ALJ failed to fulfill his duty to make "explicit findings" as to the demands of her past relevant work and to compare those to her RFC to determine whether she could do her previous work. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). But after carefully reviewing the record, we cannot see how a remand to require the ALJ to perform these duties would be of assistance in this case. We do not believe that Ms. Samons has shown that any prejudice could have resulted from this error.

The ALJ determined that Ms. Samons retained the RFC to perform a full range of light work, so long as she was not subjected to hazardous conditions or to more than moderate exposure to certain environmental conditions, including noise, humidity, dust, fumes, and temperature extremes. Ms. Samons had the burden of proving that she was unable to return to her past relevant work; if she was capable of performing any of her past relevant jobs, she was not disabled.

We believe that the ALJ's determination that Ms. Samons can return to her job as a cashier at a fast food restaurant is supported by substantial evidence. An ALJ

may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy. *See Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir.1990). The regulations refer to The Dictionary of Occupational Titles as a resource in determining the duties of a claimant's past relevant work. Section 211 of the DOT refers to several cashier positions, all of which it classifies as light work. *See also Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). And in § 311.472–010, the DOT specifically addresses "Fast Foods Worker" or "Cashier, Fast Foods Restaurant" and classifies the position, which is the position that Ms. Samons reported having held, as "Light Work." The description also states that the worker is exposed to no more than a moderate level of noise and to none of the other environmental conditions mentioned in Ms. Samons's RFC.

We need not determine whether Ms. Samons was able to return to her other past relevant work since we have concluded that nothing in her RFC affects her ability to perform the work of a cashier. Although the ALJ erred in failing to address this question sufficiently, we cannot see how this failure prejudiced Ms. Samons, and we will not remand "[a]bsent unfairness or prejudice." *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988); *see also Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).

V.

For the foregoing reasons, we affirm the judgment of the district court.

_____