# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1253
_____

Charlotte Ann Romine

*Plaintiff - Appellant*

v.

Carolyn W. Colvin, Commissioner, Social Security Administration

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 16, 2015
Filed: April 28, 2015
[Unpublished]

_____

Before WOLLMAN, SMITH, and SHEPHERD, Circuit Judges.

_____

PER CURIAM.

Charlotte Romine appeals the district court's[1] affirmance of the Social Security Commissioner's ("Commissioner") decision denying her claim for supplemental security income and disability insurance benefits. We affirm.

## I. *Background*

Romine filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, alleging a disability onset of November 10, 2009, due to neuropathy, psoriatic arthritis, carpal tunnel syndrome, and fibromyalgia. The Commissioner denied Romine's applications at the initial and reconsideration levels, and Romine requested an administrative hearing.

At the time of the hearing, Romine was 39 years old. Romine has a twelfth-grade education. In her disability applications, Romine stated that she had no problem with personal care, cared for her son and pets, prepared meals, did laundry and some cleaning, drove a car, shopped, handled money, attended church, and visited family.

The following medical evidence was produced at the hearing. Romine went to the University of Arkansas for Medical Sciences (UAMS) on June 29, 2010, complaining of joint pains in both knees and feet. Dr. Elizabeth Russell noted upon examination that Romine had full range of motion but observed some synovitis and swelling in her feet and tenderness in her thoracic and lumbar spine. Dr. Russell diagnosed probable psoriatic arthritis and neuropathy and ordered lab work and objective testing. X-rays of Romine's thoracic and lumbar spinal regions, pelvis, hands, and feet showed sacralization at L-5 and mild spurring at the calcaneus bilaterally but "NO SIGNIFICANT ARTHRITIC CHANGES IDENTIFIED."

---

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

On June 15, 2010, Romine went to UAMS for a follow-up visit, complaining of pain in her right foot, right knee, and low back. Dr. Russell prescribed Darvocet, Methotrexate, and folic acid, and she ordered Romine to return for treatment in three weeks.

On August 4, 2010, Romine went to UAMS for an electromyography and nerve-conduction study performed by Dr. Betul Gundogdu, a neurologist. Dr. Gundogdu's impression was that Romine had chronic right L5 radiculopathy and carpal tunnel syndrome in the right wrist.

On August 5, 2010, Romine returned to UAMS for her follow-up visit and reported the same symptoms that she reported during previous visit. Dr. Russell increased the dosage of Methotrexate and ordered a magnetic resonance imaging (MRI) scan of the lumbar spine. The MRI scan was performed on August 13, 2010, and showed no significant disc abnormality, neural foraminal narrowing, or spinal canal stenosis. But it did show mild facet joint arthropathy and fluid in the face joints at L2-3, L3-4, and L4-5.

On September 2, 2010, state-agency consultant Dr. Bill Payne reviewed Romine's medical records and reported that she maintained the functional capacity to perform light work activity with postural limitations.

On September 14, 2010, Dr. Russell completed a "Confidential Report of Medical Examination of Patient" on Romine for the Arkansas Department of Human Services. The date of the exam is listed as August 5, 2010. Under "Medical History," Dr. Russell indicated that Romine was "just beginning medical treatment" for "pain and swelling of joints due to psoriatic arthritis." She also noted that Romine had pain down her right leg and evidence of L-5 radiculopathy and carpal tunnel syndrome. Dr. Russell listed her "Significant Findings" as "synovitis (warmth, swelling, tenderness) in MCP, MTP, wrist joints bilaterally." She placed a "Minimal Limitation" on

standing and a "Moderate Limitation" on stooping, kneeling, walking, pushing, pulling, and carrying. Dr. Russell also placed a five-pound lifting limitation on Romine. When asked to give an estimate of the length of time that Romine's psoriatic arthritis would prevent Romine from performing any gainful work activity, Dr. Russell stated that it was "unclear." But Dr. Russell opined that Romine's condition was improving.

Dr. Robert A. Ortmann and Dr. Alina Voinea saw Romine during a follow-up visit at UAMS on September 21, 2010. Dr. Voinea referred Romine to pain management for injection of her lumbar facet joints and recommended that she follow up with Dr. Russell in three months.

On November 3, 2010, Romine went to UAMS complaining of low back pain and requesting facet joint injections. Dr. Ahmed Ghaleb noted that Romine's gait was antalgic to the right and that she was able to do toe- and heel-walking with some pain. Dr. Ghaleb stated that he explained the risks, benefits, and alternatives of performing injections and would have Romine scheduled for the procedure. Romine received the facet joint injections on November 18, 2010.

Romine saw Sandra D. Canterberry, a nurse practitioner at AR Care, on December 15, 2010. Canterberry noted that Romine complained of joint pain but stated that her medications were helping.

Romine returned to the UAMS Rheumatology Clinic for a follow-up visit on December 20, 2010. Romine continued to complain of low back pain and swelling in her joints. Dr. Russell slightly modified Romine's prescriptions and completed a medical source statement (MSS). In the MSS, Dr. Russell opined that Romine could lift and carry less than ten pounds frequently or occasionally, stand and walk less than two hours, and sit less than four hours in an eight-hour workday. Dr. Russell indicated that Romine would need the following special requirements at the

-4-

workplace: (1) changing positions frequently, (2) frequent rest periods, and (3) the opportunity to shift, at will, from sitting or standing/walking. Dr. Russell indicated that Romine would not need to elevate her feet or have longer than normal breaks. Dr. Russell set forth the following "medical findings [to] support [Romine's] limitations":

> This patient has ongoing synovitis (inflammation) of her wrists, tendons in her hands, small joints of the hands, and both knees as well as spine. She is unable to grip and repeatedly grasp due to swelling and pain in these areas and currently is unable to squat, kneel or engage in prolonged walking or sitting due to her spinal inflammation/pain.

As to Romine's "Manipulative Restrictions," Dr. Russell indicated that Romine was unable to reach, finger, or handle. To support these findings, Dr. Russell explained that Romine "has swelling and pain from inflammation involving her hand and wrist joints, as well as tendons in both hands, making it very difficult to grasp and pinch."

Additionally, Dr. Russell indicated that Romine was to "[a]void [c]oncentrated [e]xposure" to extreme heat, high humidity, solvents/cleaners, and chemicals and to "[a]void [e]ven [m]oderate [e]xposure" to extreme cold. Dr. Russell imposed "[n]o [r]estriction[s]" on Romine's exposure to fumes, odors, dusts, and gases; perfumes; soldering fluxes; and sunlight.

Dr. Russell anticipated that Romine's impairments or treatment would cause her to be absent from work "[a]bout 1 day a month." When asked whether "[t]he limitations have lasted or are expected to last for at least one year or longer," Dr. Russell checked "[n]o" and explained that Romine "is presently undergoing treatment: hopefully she will improve."

On January 24, 2011, Romine again saw Dr. Russell at the UAMS Rheumatology Clinic. Dr. Russell noted "[n]o active synovitis but synovial

thickening of scattered flexor tendons, MCPs, wrists, ankles" and that Romine's lumbar spine was "painful with twisting." Dr. Russell also noted mild degenerative joint disease and recommended a retrial of Methorexate before considering any further treatment.

Dr. Russell examined Romine again on March 7, 2011, noting similar findings as the prior visit. Dr. Russell prescribed Humira and decreased Romine's dosage of Methotrexate.

At a follow-up visit on April 21, 2011, Dr. Russell noted that Romine had

> improved considerably since beginning Humira, and I am continuing her on that plus methotrexate over the coming weeks. She has very minimal synovitis in her wrists and hands only at this time. Her cutaneous psoriasis is also significantly improved. She is having some difficulty with fibromyalgia, and I discussed with her the rational[e] for treatment for that.

Dr. Russell's notes from the follow-up visit further indicated that Romine had started Humira for her psoriatic arthritis "just 2 months ago [approximately February 2011] and is not clear if she feels better or not." But Dr. Russell reported that Romine "does feel that the swelling is improved in her joints, although she is still complaining of 1 hour of morning stiffness in her hands and low back. She feels she still has pain in her wrists, elbows, knees, and ankles, although it is somewhat better." Romine told Dr. Russell that she had "pain over the muscles of the superior shoulders and . . . [could not] sleep because she ran out of gabapentin." Dr. Russell noted that Romine "has minimal thickness in the wrists and flexor tendons bilaterally as well as both ankles. These are not tender, and there is no evidence of synovitis elsewhere. She has a full range of motion." Dr. Russell also noted that Romine was independent in her activities of daily living, including bathing, dressing, grooming, feeding, and ambulating.

Dr. Russell's impression of Romine's psoriatic arthritis was that the condition "has improved, although I think it is not completely controlled. Given that [Romine] is continuing to improve, I will maintain the Humira and watch for another month or so." Dr. Russell's plan was to "[c]ontinue Humira and methotrexate at the same doses." Dr. Russell also "advise[d] aerobic exercise schedule daily, to start gradually, as well as efforts to improve her sleep."

At the administrative hearing, Romine testified that she had swelling and inflammation in her joints, which made it difficult for her to grasp items, bend, squat, sit, and stoop. She stated that she took shots of Methotrexate weekly and Humira every other week, which improved her conditions. She testified that her doctor restricted her from lifting more than five pounds and that she cared for her school-age son, including preparing meals, taking her son to doctor appointments, shopping, and performing light housework.

The administrative law judge (ALJ) posed to Vocational Expert (VE) Mack Welch a hypothetical question limiting an individual to light work activity with no exposure to hazards, no climbing of ladders, ropes or scaffolds, and no more than occasional postural activities. Welch testified that such an individual could perform other work as a cashier, for which there were 100,000 regional jobs and 500,000 national jobs; as a hand packer, for which there were 81,000 regional jobs and 400,000 national jobs; and as a bench assembler, for which there were 53,000 regional jobs and 250,000 national jobs.

The ALJ employed the mandatory five-step sequential evaluation process and determined that although Romine had severe impairments, those impairments did not meet or equal a listing. The ALJ found that Romine had the residual functional capacity (RFC) to do less than a full range of light work. Based on Welch's testimony that there were a significant number of jobs in the economy which Romine could perform with her limitations, the ALJ determined that she was not disabled under the

Social Security Act. In reaching his conclusion, the ALJ summarized the evidence as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> The UAMS Rheumatology Clinic report dated April 21, 2011 states Ms. Romine was independent for her activities of daily living. While this finding does not directly contradict the claimant's testimony or her daughter's testimony, it does suggest that Ms. Romine's movements are less restricted than is alleged. The UAMS finding that Ms. Romine is independent in her ambulation does not conform to the testimony that she can walk just 20–30 steps. Nor does the independent rating for bathing, dressing, and grooming support the claimant's allegation of great pain and stiffness in her hands and wrists. On March 7, 2011, she had no deformity and only mild active synovitis in the MCPs and flexor tendons. There was some swelling in her wrists and ankles, but no fluid palp. Her other joints showed no active synovitis (9F, p.5). Ms. Romine's swelling was reduced through taking Humira. Her morning stiffness in her hands and low back was limited to an hour.
>
> In sum, the above residual functional capacity assessment is supported by DDS medical consultant Dr. Bill Payne's Physical Residual Functional Capacity Assessment. Dr. Payne saw Ms. Romine's postural activities being occasionally limited. There were no fine or gross manipulation limitations and no limitations on reaching in all directions. Dr. Payne considered Ms. Romine able to stand and/or walk or sit for about 6 hours in an 8-hour workday (4F).
>
> *Limited weight is granted Dr. Russell's medical source statement.* It shows the claimant with significant limitations. Yet, on September 14, 2010, Dr. Russell expressed the view that Ms. Romine's arthritis and

lumbar radiculopathy were improving. At that time, Ms. Romine had only moderate limitations for stooping, kneeling, walking, pushing, pulling, and carrying. Her standing was limited, but only minimally (12F, p. 4). *Therefore, the undersigned finds Dr. Russell's views to be somewhat inconsistent.* Also, the medical reports aside from Dr. Russell's medical source statement do not generally support the level of impairment and restriction it gives Ms. Romine.

(Emphases added.)

Following the ALJ's decision, the Appeals Council found no reason to review the ALJ's decision and denied Romine's request for review. Romine then appealed to the district court, and the district court affirmed the Commissioner's decision.

## II. *Discussion*

On appeal, Romine argues that the ALJ erred by not giving controlling weight to the opinion of Romine's treating physician, Dr. Russell. She also asserts that the ALJ asked hypothetical questions to the VE based on an RFC that was substantially inconsistent with Dr. Russell's conclusions.

We review de novo the district court's affirmance of the Commissioner's denial of disability benefits and will affirm the Commissioner "if 'the Commissioner's denial of benefits complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).

Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it

because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.

*Id*. (quotation and citation omitted).

The social security regulations provide that "the commissioner will generally give a treating physician's 'opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)' 'controlling weight' when it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Id*. at 1103 (alterations in original) (quoting 20 C.F.R. § 416.927(d)(2)).[2] But because

> the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control. *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014). "A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (internal quotation marks and citation omitted). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff* [*v. Barnhart*], 421 F.3d [785,] 790 [(8th Cir. 2005)] (internal quotation marks and citation omitted). An ALJ may also give less weight to a conclusory or inconsistent opinion by a treating physician. *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007).

*Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014).

---

[2]"For clarity, we note the agency moved the operative language from § 416.927(d)(2) to § 416.927(c)(2) in 2012." *Id*. at 1103 n.3.

An "ALJ [is] not required to give controlling weight" to a treating physician's opinion where substantial evidence in the record exists "to support the ALJ's finding that certain opinions in the Medical Source Statement are inconsistent with [the treating physician's] own treatment notes and other relevant evidence." *Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011); *see also Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) ("Substantial evidence supported the ALJ's decision to discount the opinions of Dr. Lowder and Dr. Moore regarding Teague's functional limitations. Dr. Lowder's MSS did not cite clinical test results, observations, or other objective findings as a basis for determining Teague's capabilities."); *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) ("The ALJ rejected Dr. Stanley's assessment because it was inconsistent with Dr. Stanley's own treatment notes, with objective testing, and with other medical evidence in the record. Our review of the record, including reports from Dr. Pulcher, Dr. King, Dr. Flageman, and the Truman Medical Center confirms the ALJ's conclusion."); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (concluding that the ALJ did not err in discounting the inconsistent and unsupported portions of treating physician's medical source statement, where the ALJ found that the limitations detailed in the statement stood alone and were never mentioned in the physician's numerous records of treatment, nor were they supported by any objective testing or reasoning which would indicate why the claimant's functioning needed to be so restricted, and where claimant's condition was repeatedly described in physician's notes as "mild," the records from claimant's other physicians indicated that her condition was being controlled by medication, and the weight of the medical evidence was more in keeping with the restrictions described by the consulting physician).

Thus, while the general rule is that "the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician," an ALJ may credit a consulting physician's opinion over a treating physician's opinion "where a treating physician renders inconsistent opinions that

undermine the credibility of such opinions." *Wagner v. Astrue*, 499 F.3d 842, 849 (quotations and citations omitted).

"Upon reviewing the ALJ's reasons for discounting some of Dr. [Russell]'s opinions in the Medical Source Statement, we conclude that the ALJ did not err." *Perkins*, 648 F.3d at 899 (citation omitted). First, a comparison between the September 14, 2010 report and the December 20, 2010 MSS show inconsistencies in Dr. Russell's opinions. In September 2010, when Romine was "just beginning medical treatment," Dr. Russell placed a "Minimal Limitation" on Romine's standing; by contrast, in the MSS, Dr. Russell placed the greatest limitation on Romine's standing—less than two hours in an eight-hour day. Furthermore, in her written notes in the MSS, Dr. Russell stated that Romine is "unable to squat, kneel, or engage in prolonged walking or sitting due to her spinal inflammation/pain." Dr. Russell's conclusion that Romine is "unable" to do these activities is a drastic shift from her observation two months prior in the September report that Romine was "improving" and Dr. Russell's placement of minimal restrictions on Romine's standing and moderate restrictions on Romine's stooping, kneeling, and walking.

Second, "[t]he record as a whole in this case, including the inconsistencies in the evidence, [Romine's] daily activities, and the effectiveness [of her] medication, casts significant doubt on both [Romine's] and Dr. [Russell]'s . . . assertions that [Romine] could not perform sedentary work during her coverage period." *Ponder v. Colvin*, 770 F.3d 1190, 1194 (8th Cir. 2014) (third alteration in original) (quotations and citation omitted). Like the September report, the April 21, 2011 notes indicate Romine's continued improvement. Specifically, Dr. Russell opined that Romine had "improved considerably since beginning Humira." Dr. Russell also indicated in the April notes that Romine had "very minimal synovitis in her wrists and hands." "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

The April notes also show that Dr. Russell recommended that Romine begin daily aerobic exercise. "A lack of functional restrictions on the claimant's activities is inconsistent with a disability claim where, as here, the claimant's treating physician[] [is] recommending increased physical exercise." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citation omitted).

Finally, the functional assessment of Romine from her visit to the UAMS Rheumatology Clinic on April 21, 2011, provides that Romine is "independent" in all areas—bathing, grooming, feeding, and ambulation.

We therefore hold "that the ALJ could credit the opinion of the consulting physician over that of the claimant's [treating physician, Dr. Russell,] because of inconsistencies in [Dr. Russell's] opinions." *Wagner*, 499 F.3d at 849 (citing *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003)). "While we acknowledge[] that the consulting physician 'did not have the same treating relationship that [Dr. Russell] had with [Romine],' we conclude[] that the consulting physician's opinion was not tainted with the apparent inconsistencies of [Dr. Russell's] assessment.'" *Id*. at 849–50 (quoting *Anderson*, 344 F.3d at 813). For that reason, the ALJ did not err in basing his RFC assessment on Dr. Payne's conclusion that Romine maintained the functional capacity to perform light work activity with postural limitations.

III. *Conclusion*

Accordingly, we affirm the denial of benefits.

_____